UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LARRY R. WELLS,                                    Civil No. 04-5098 (JMR/FLN)

            Plaintiff,

v.

JO ANNE B. BARNHART,                    **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

            Defendant.

_____

George H. Smith, Esq., for Plaintiff .
Lonnie F. Bryan, Assistant United States Attorney, for the Government.

_____

Plaintiff Larry R. Wells seeks judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), who denied his application for disability insurance benefits

("DIB"). See 42 U.S.C.A. §§ 416(i), 423(d). This Court has appellate jurisdiction over the claim

pursuant to 42 U.S.C. § 405 (g). The matter was referred to the undersigned United States

Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

The parties have submitted cross-motions for summary judgment [#12 and #17]. For the reasons

set forth below, it is the Court's recommendation that the Commissioner's decision be affirmed.

## I.    INTRODUCTION

Plaintiff Larry R. Wells filed two applications for Social Security Disability Insurance

Benefits. The first application was filed on August 4, 2000. (Tr. at 109.) This request was denied

on November 9, 2000, and a Request for Reconsideration was denied on January 29, 2001. (Tr. at

69, 74, 76.) Plaintiff filed the second application for Disability Insurance Benefits on August 27,

2002, and that application was denied on December 9, 2002. (Tr. at 79, 113.) Plaintiff's Request

for Reconsideration was denied, and Plaintiff filed a Request for Hearing on March 5, 2003.  (Tr. at 82, 84, 86.)  A hearing on this matter was held on December 17, 2003, before Administrative Law Judge (hereinafter "ALJ") Diane Townsend-Anderson.  (Tr. at 32.)  On May 28, 2004, ALJ Townsend-Anderson issued an unfavorable decision.  (Tr. at 16-27.)

The ALJ found that Plaintiff retained the residual functional capacity (hereinafter "RFC") to perform light work that involved "occasionally lifting up to twenty pounds, frequently lifting up to ten pounds, with easy access to a bathroom and low level semiskilled work consisting of three to four step tasks, with low stress, minimal industrial standards for production and pace, and performed in an alcohol and drug free environment." (Tr. at 22.)  The ALJ therefore concluded that Plaintiff did not meet the statutory criteria for a finding of disability.  Plaintiff appealed this decision to the Appeals Council on June 1, 2004.  (Tr. at 15.)  The Appeals Council denied review on October 29, 2004, making the decision of the ALJ the final decision of the Commissioner.  (Tr. at 9-11.)

Plaintiff initiated this action seeking judicial review on December 28, 2004. [#1].  Plaintiff moved for summary judgment on September 20, 2005 (Docket No. 12.).  The Commissioner for Social Security moved for summary judgment on December 22, 2005. (Docket No. 18.)  Plaintiff raises the following issues in his Motion: 1) whether the ALJ erred by not giving the proper weight to the testimony of Dr. Carl Malmquist; and, 2) whether the ALJ conducted a meaningful credibility analysis.

## II.  STATEMENT OF FACTS

### A.     Background

Plaintiff was born on February 14, 1947, and was 57 years of age at the time of the administrative hearing.  (Tr. at 19.)  Plaintiff has a high school education and he attended the

University of Minnesota for several years but did not graduate from college. (Tr. at 33-34.) Plaintiff attended Northwestern Electronics for three years and obtained a certificate as an electronic technician. (Tr. at 34.) Plaintiff has past relevant work experience as an injection molding machine tender, an electronics worker, an electronics assembler and a janitor. (Tr. at 43-44, 159, 161, 169.) Plaintiff served in the military from July 1966 to July 1968. (Tr. at 33.) Plaintiff suffers from post residuals of prostate cancer, depression, and hepatitis C. (Tr. at 168.) Plaintiff alleges that he has been disabled since February 15, 2000, due to these conditions. (Tr. at 168.)

### B.    Medical Evidence

Plaintiff was admitted into the hospital on July 2, 1999 after having a bilateral pelvic lymphadenectomy and radical prostatectomy. (Tr. at 216-25.) These procedures were performed on Plaintiff for the treatment of carcinoma of the prostate. (Tr. at 216, 227.) Plaintiff was discharged on July 7, 1999, after the operations were performed successfully. (Tr. at 216-17.) The pathology conducted on Plaintiff was positive for Gleason grade 3/4 adenocarcinoma of the prostate. (Tr. at 259.) One month after the surgery, Hoo Yin Wong, M.D., advised Plaintiff to receive adjuvant prostatic bed radiation treatment for the carcinoma. (Tr. at 229.) At this follow up visit Dr. Wong noted that Plaintiff's "incision is well healed. He is almost totally continent, but he does have a mild amount of incontinence with stress." (Tr. at 229.)

In August 1999, Plaintiff was seen by John Kosiak, M.D., to discuss radiation therapy with Plaintiff. (Tr. at 262-263.) At that time Plaintiff reported that he was experiencing "some continued urinary incontinence which [was] gradually improving." (Tr. at 262.) On December 12, 1999, Dr. Wong reported that Plaintiff was "totally continent." (Tr. at 228.) On January 5, 2000, Plaintiff was evaluated by Dr. Kosiak, who noted that Plaintiff was "doing well at this time" but that Plaintiff did

"note some slight stress incontinence with coughing." (Tr. at 261.)

In May 2000 Plaintiff completed an employment evaluation at the Vinland Center. (Tr. at 264-284.) Plaintiff reported that he was not on any medication at that time and that he was not experiencing any pain. (Tr. at 265, 276.) When Plaintiff was first evaluated at Vinland, his Beck Depression Inventory Score[1] was 34, indicating severe depression. (Tr. at 282.) When Plaintiff was tested during the last week of the program, Plaintiff's score was 13, indicating mild depression. (Tr. at 282.)

On July 18, 2000, Plaintiff was admitted to the Veterans Administration Medical Center (hereinafter VAMC) in St. Cloud, Minnesota, for in-patient chemical dependency rehabilitation. (Tr. at 285-293.) Plaintiff's main chemical dependency issues at the time surrounded his use of crack-cocaine and alcohol. (Tr. at 287.) At the time of his admission Plaintiff reported that he "does occasionally have dribbling of urine since the prostate surgery." (Tr. at 289.) Plaintiff's Global Assessment of Functioning[2] (hereinafter "GAF") was a 52, indicating moderate functional symptoms. (Tr. at 285.) Plaintiff left the chemical dependency program after seven days of treatment for an unspecified reason. (Tr. at 285.)

On August 1, 2000, Plaintiff was evaluated by Dr. Wiltold Krasniewski, a staff psychiatrist at the VAMC in St. Cloud, Minnesota. (Tr. at 390.) At that time Plaintiff was referred to Dr.

---

[1]The Beck Depression Inventory measures the level of depression in a client. A score between 30-39 indicates severe depression. A score of 10-19 on the test indicates mild depression. See Tr. at 282; see also http://www.nhlbi.nih.gov/meetings/workshops/depression/instruments.htm.

[2]The GAF scale score represents the clinician's overall assessment of the patient's ability to function. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 30 (4th ed. 1994), ("DSM-IV").

Krasniewski for evaluation of possible depression.  Dr. Krasniewski noted that he "explained that [Plaintiff's] recurrent episodes of dysphoria are probably triggered by substance abuse. [Dr. Krasnieski] also explained that the meaningful evaluation for depression can be done only after a period of sobriety of at least a four- to six-week duration."  (Tr. at 390-91.)  Dr. Krasniewski diagnosed Plaintiff with "Cocaine and Alcohol-induced Mood Disorder with Depressive Features, versus Depressive Mood Disorder not otherwise specified, mild."  (Tr. at 391.)  Dr. Krasniewski did not recommend any psychotropic medications and, at that time Plaintiff's GAF score was 65 to 70, indicating some mild symptoms.  (Tr. at 391.)

On September 9, 2000, Plaintiff was examined by Alford S. Karayusuf, M.D., for an Agency-ordered consultative examination.  (Tr. at 294.)  Plaintiff told Dr. Karayusuf that he had been experiencing bladder and bowel control difficulties due to his prostate operation.  (Tr. at 294.)  Dr. Karayusuf concluded that Plaintiff "is able to understand, retain, and follow simple instructions.  He is able to interact appropriately with fellow workers, supervisors, and the public.  He is able to maintain pace and persistence, based on his psychiatric and not his physical condition."  (Tr. at 296.)  Dr. Karayusuf provided a provisional diagnosis that Plaintiff suffered from "[a]djustment disorder with depressed mood."  (Tr. at 296.)

On September 25, 2000, Plaintiff was admitted into VAMC in St. Cloud, Minnesota, for chemical dependency treatment.  (Tr. at 307.)  On September 26, 2000, Plaintiff was evaluated at VAMC in St. Cloud, Minnesota, by Charlotte Roeber, CNS, CNP.  (312-315.)  At that time Plaintiff reported "frequent episodes of urinary dribbling" and "nocturia, getting up to void five to six times a night.  He reports that this had been continuous since he had the prostate surgery."  (Tr. at 313.)  At that time Plaintiff also reported that his mood was depressed, and that he had an ongoing loss of

appetite and difficulty sleeping.  (Tr. at 314.)  Nurse Practitioner Roeber prescribed 20 milligrams of Celexa for depression.  (Tr. at 314.)

On October 3, 2000, Dr. Walter Krasniewski noted that Plaintiff reported "that his mood has improved some and that his recurrent depressive episodes, although still present, have been less frequent and less intense during the past week."  (Tr. at 311.)  Dr. Krasniewski recommended that Plaintiff continue taking twenty milligrams of Citalopram for his depression, and noted that Plaintiff did not seem to be suffering any significant side effects from this medication.  (Tr. at 311.)

On October 7, 2000, Plaintiff obtained a pass to leave the Chemical Dependency Treatment Program for the day.  (Tr. at 309.)  While out on the pass, Plaintiff used cocaine, and he subsequently tested positive for cocaine after urinalysis was conducted upon his return to the treatment center.  (Tr. at 309.)  Plaintiff was discharged Irregular from treatment related to his use of cocaine while out on the pass.  (Tr. at 307.)  At the time of his discharge, it was noted that Plaintiff's "condition at discharge is that his cocaine dependence is continuous, and his hepatitis C status is active, but he is unable to sustain abstinence from cocaine and alcohol long enough to seek treatment . . . We cannot initiate treatment for his hepatitis C without some evidence of abstinence."  (Tr. at 307.)

In October 2000 Jeffrey Gorman, M.D. reviewed Plaintiff's medical records for the Agency, and he opined that Plaintiff retained the ability to perform work at the medium exertional level.  (Tr. at 297-306.)   Alan Suddard, M.D. reviewed Plaintiff's records again on January 25, 2001, and reaffirmed Dr. Gorman's assessment that Plaintiff could work at the medium exertional level.  (Tr. at 304.)

On November 5, 2000, Plaintiff was evaluated by James Alsdurf, Ph.D., LP, for a mental

residual functional capacity assessment.  (Tr. at 316-35.)  Dr. Alsdurf performed a Mental Residual Functional Capacities Assessment for the Department of Disability Determination Services (DDS). (Tr at 316-35.)  Dr. Alsdurf diagnosed Plaintiff with Adjustment Disorder with depressed mood. (Tr. at 318.)  Dr. Alsdurf concluded that Plaintiff had a mild degree of limitation concerning restriction of activities of daily living and mild difficulties in maintaining social functioning.  (Tr. at 332.) Dr. Alsdurf concluded that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace, and that Plaintiff did not experience any episodes of decompensation.  (Tr. at 332.)  As for Plaintiff's ability to perform work-related functions, Dr. Alsdurf opined that Plaintiff retained "the capacity to concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions."  (Tr. at 318.)  Dr. Alsdurf further opined that Plaintiff's "ability to carry out tasks with adequate persistence and pace would be intact for routine, repetitive, or three and four step tasks, but moderately impaired for detailed and markedly impaired for complex tasks."  (Tr. at 318.)  Dr. Alsdurf noted that Plaintiff's "ability to interact and get along with co-workers would be moderately impaired, but adequate for brief and superficial contact."  (Tr. at 318.)  Dr. Alsdurf noted that Plaintiff's "ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact" and that Plaintiff's ability "to sustain an ordinary routine without special supervision [was] not significantly impaired."  (Tr. at 318.)  Dr. Alsdurf concluded that Plaintiff's "ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and a three and four step work setting."  (Tr. at 318.)

On November 13, 2000, Plaintiff was again admitted to VAMC in St. Cloud, Minnesota, for

chemical dependency treatment.  (Tr. at 336.)  Plaintiff was discharged from that program after he was granted a five hour pass to attend a funeral, and Plaintiff returned to the treatment center and tested positive for cocaine, amphetamines, and alcohol.  (Tr. at 336.)  During his discharge, it was noted that "[h]is status is that he continues to have difficulty remaining abstinent for us to address the hepatitis C issues."  (Tr. at 336.)  At the time of his discharge Plaintiff was still taking Ciralopram for his depression.  (Tr. at 336.)

On March 9, 2001, Plaintiff visited VAMC in St. Cloud and was seen by Nurse Practitioner Roeber.  (Tr. at 382.)  Nurse Practitioner Roeber noted that "we did discuss the requirement that if he considering [sic] himself to be a candidate for hepatitis C treatment, that he needs to be sober and clean for a period of at least six months."  (Tr. at 382.)  On the same day, March 9, 2001, Plaintiff saw Dr. Krasniewski at VAMC in St. Cloud, Minnesota.  (Tr. at 383.)  Dr. Krasniewski noted that Plaintiff reported that

> in November of last year he . . . subsequently quit taking the antidepressant and relapsed into drinking as well as smoking crack.  He has been drinking and abusing cocaine in binges.  He reports that since that time his mood deteriorated gradually and at the present time he has been feeling at least moderately depressed . . . He would like to restart the antidepressant treatment.

(Tr. at 383.)  Dr. Krasniewski noted that his impressions were that Plaintiff suffered from "Cocaine and Alcohol-induced Mood Disorder with Depressive Features" and ordered Plaintiff to restart Citalopram at twenty milligrams per day.  (Tr. at 383.)

On September 13, 2002, Plaintiff returned to the VAMC in St. Cloud, Minnesota, for admission to the Residential Chemical Dependency Center Program.  (Tr. at 377.)  Plaintiff was discharged Irregular from the program on September 25, 2002, because Plaintiff consumed alcohol while out on a pass.  (Tr. at 372.)  On September 17, 2002 Plaintiff was seen by Terrence J. Duffy,

M.D., who is a urologist.  (Tr. at 375.)  At the time of Plaintiff's visit he did not report experiencing any urinary incontinence problems.  (Tr. at 375.)

On November 12, 2002, Plaintiff entered the residential phase of the Substance Abuse Treatment Program at VAMC St. Cloud.  (Tr. at 199.)  Plaintiff completed the program on December 13, 2002.  (Tr. at 199.)

On December 6, 2002, Charles T. Grant, M.D., reviewed Plaintiff's records and opined that Plaintiff retained the ability to work at the light exertional level.  (Tr. at 418-425.)  Dr. Grant noted the following physical limitations: Plaintiff could occasionally lift a maximum of twenty pounds, frequently lift a maximum of ten pounds, stand or walk about six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday.  Dr. Grant noted that Plaintiff's "objective RFC is non-severe, reduced to light because of partially credible symptoms: fatigue and 'bladder problems,'" however, Dr. Grant noted that "no urinary symptoms were reported in 9-17-02 urology note."  (Tr. at 420, referring to Tr. at 375.)  On February 25, 2003, Dr. Larson reviewed all of the evidence in the file, along with the assessment completed by Dr. Grant, and affirmed the December 6, 2002, assessment.  (Tr. at 425.)

On December 18, 2002, Plaintiff was evaluated by Patricia Sohler, Ph.D, at the VAMC in St. Cloud, Minnesota, for a post-traumatic stress disorder (hereinafter PTSD) evaluation.  (Tr. at 358-363.)  At that time, Plaintiff "was administered the MMPI2 and MCM12."  (Tr. at 362.)  Dr. Sohler concluded that Plaintiff "achieved scores on the validity scales of the MMPI2 and MCM12 that indicated that he approached the testing in a manner that can be considered honest and open."  (Tr. at 362.)  Therefore, Dr. Sohler concluded that "the results of the tests can be considered a valid approximation of [Plaintiff's] psychological functioning.  Results indicate[d] that he is suffering a

high level of depressive symptoms, including low self esteem, mental dullness, mental brooding, and physical symptoms related to depression." (Tr. at 362.) Dr. Sohler concluded that Plaintiff "does not meet the criteria for Posttraumatic Stress Disorder. He appears to be suffering from depression primarily related to his physical illnesses and limitations, and difficulty in developing a life that is not associated with drugs and alcohol." (Tr. at 363.)

On January 15, 2003, Plaintiff was seen by Dr. Krasniewski. (Tr. at 446.) Plaintiff reported to Dr. Krasniewski that "he does not feel depressed, and he does not demonstrate any clinical signs of emotional distress. Consequently, he does not appear to be in need of psychopharmcotherapy." (Tr. at 446.) On January 30, 2003, Plaintiff was seen by Nurse Practitioner Mary Kosiba. (Tr. at 435-36.) At that time Plaintiff asked for more incontinence pads because he had a cold and was sneezing due to the cold, which caused him to dribble urine more frequently. (Tr. at 435.)

On February 15, 2003, Plaintiff's records were assessed by Patrick Shields, Ph.D, L.P., and he performed a Mental Functional Capacities Assessment. (Tr. at 400.) Dr. Shields concluded that Plaintiff's "ability to carry out tasks with adequate persistence and pace would be intact for routine, repetitive, or three and four step tasks, but moderately impaired for detailed and markedly impaired for complex tasks." (Tr. at 400.) Dr. Shields further concluded that Plaintiff's "ability to interact and get along with co-workers would be moderately impaired, but adequate for brief, infrequent, and superficial contact." (Tr. at 400.) Dr. Shields concluded that Plaintiff's "ability to interact with the public would not be significantly impaired" and that Plaintiff's "ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings." (Tr. at 400.) Dr. Shields concluded that Plaintiff's "ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a

routine, repetitive work setting." (Tr. at 400.)  Dr. Shields concluded that Plaintiff had mild restrictions concerning activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (Tr. at 412.)

On May 12, 2003, Plaintiff was seen by Dr. Krasniewski for depression.  (Tr. at 431.) Plaintiff reported that "for the past two months he has been struggling with loneliness and that he had gradually become sad and dysphoric." (Tr. at 431.)  Plaintiff further reported that "[a]lthough his sleep pattern and energy did not change, he has been lately less motivated and less capable of enjoying his usual pleasurable activities." (Tr. at 431.) Dr. Krasniewski reported "remembering that Citalopram, when prescribed in 2000/2001 was helpful, [Plaintiff] is interested in trying it again." (Tr. at 431.)  At the time of this visit, Plaintiff stated that he was successfully abstaining from alcohol, cocaine, and other illicit substances.  (Tr. at 431.)  That same day Plaintiff had an appointment with the Veterans Administration vocational rehabilitation counselor.  (Tr. at 430.) However, Plaintiff changed his mind and decided not to pursue the full interview or to create a vocational plan of care.  (Tr. at 430.)  Plaintiff was reportedly interested in the educational opportunities and he was given information about these opportunities.  (Tr. at 430.)

On September 19, 2003, Plaintiff was seen at the VAMC in Minneapolis by J.C. Whiteacre II, M.D.  (Tr. at 427-429.)  Plaintiff noted that he was successfully abstaining from cocaine since his discharge from substance abuse treatment, but that he drinks up to four beers at a time.  (Tr. at 427.)  Plaintiff denied experiencing any problems from his alcohol consumption.  (Tr. at 427.)  At that time Plaintiff reported that " he has nocturia times two and occasionally wets himself." (Tr. at 428.)  At that time, Plaintiff's GAF score was 50, indicating serious symptoms.  (Tr. at 428.)

### C.      Plaintiff's Testimony

Plaintiff testified at the hearing on December 17, 2003.  (Tr. at 33-52.)  Plaintiff testified that

the reason he believed that he could not work at a full-time job was

> because of the cancer . . . I had the prostate operation . . . it depressed me for one
> thing.  And secondly, I have trouble controlling my . . . bladder and . . . they said that
> the prostate cancer causes bladder problems, and the radiation treatment caused me
> to have bowel problems.  So you know . . . I have to wear these pads all that time .
> . . and in the jobs I've done . . . the pads create a smell problem.  When I go to the
> bathroom, I don't know what's going to happen when I go . . . one doctor told me I
> should just sit down whenever I go . . . instead of using the urinal because I don't
> know what end is going to work.  It's an incontinence problem . . . they said.

(Tr. at 34-35.)  Plaintiff further testified that he could not work a full-time job because he suffered

from depression.  (Tr. at 35.)  Plaintiff testified "I can't concentrate on anything, because . . . I don't

know when I'm going to have to go to the bathroom.."  (Tr. at 35.)   When asked what other

symptoms of depression Plaintiff was suffering from, he responded, "You know, I don't know what

depression is . . . I mean, the doctor's been telling me I'm depressed.  I, I tell them there's nothing

wrong with me . . . but I don't know."  (Tr. at 35-36.)  Plaintiff testified that he had never been

hospitalized as an adult for mental or emotional problems, and that he was currently seeing a

therapist.  (Tr. at 36.)  Plaintiff testified that at that time he was attending a life skills group every

Monday, Wednesday and Friday from 9:00 a.m. to 12:00 p.m.  (Tr. at 37.)  Plaintiff testified that he

was currently on medications but did not remember the names of those medications.  (Tr. at 37.)

Plaintiff testified that he did not experience any side effects from these medications.  (Tr. at 38.)

Plaintiff testified that he has a problem remembering to take his medication everyday.  (Tr at 38.)

The ALJ stated, "you indicated that you don't think you're depressed, it's the doctors who think

you're depressed?"  Plaintiff responded, "I didn't think I had prostrate [sic] cancer, but they said I

had that."  (Tr. at 39.)  The ALJ asked Plaintiff, "Do you think you're depressed, sir?" and Plaintiff

stated, "sometimes, like now when you ask me that question . . . I'm depressed . . . when I walked in here I didn't think I was depressed.  I had told Mr. Smith that I didn't think I was depressed, but now." (Tr. at 39.)  When asked what made Plaintiff believe he was depressed at that time, Plaintiff stated, "Because I'm sad . . . don't know what's going to happen, I mean, it's just a bad feeling." (Tr. at 39.)

Plaintiff testified that he receives 60 percent disability from the Veterans Administration due to his prostate cancer, and that this amounts to a check for a total of $882.00 per month.  (Tr. at 39.) Plaintiff testified that he has looked for a job, but he is always rejected.  (Tr. at 40.)  When asked where he looked for a job, Plaintiff stated that he went to the Veterans Administration and applied for two jobs but was rejected both times.  (Tr. at 40.)  Plaintiff testified that he keeps himself busy by taking care of his house.  (Tr. at 40.)  Plaintiff testified that he goes to the YMCA once a week, and that on good days he walks to the YMCA, which is approximately one mile away from his home.  (Tr. at 41.)  When asked how long he could stand, Plaintiff responded, "I don't know how long I can stand because I haven't had to stand." (Tr. at 41.)  When asked how long Plaintiff could sit, excluding his frequent requirement to use the bathroom, Plaintiff said he could sit all day.  (Tr. at 42.)  During Plaintiff's testimony the ALJ stated, "the Court recognizes the fact that [Plaintiff] has had a long and good work history." (Tr. at 44.)  Plaintiff testified that he has to use the bathroom two to three times an hour, and that this is the pattern that has been present ever since his prostate surgery in 1999. (Tr. at 46-47.)  Plaintiff also testified that, during his previous job during an eight hour work day, he used the bathroom around 32 times.  (Tr. at 46.)

When asked by Dr. Malmquist, "Do you ever get so depressed that you just can't seem to function at all, you just need to sit and can't get energized, get moving?" Plaintiff responded, "Yeah

. . . it's happening now.  That's okay, though, I can get through that."  (Tr. at 48.)  When asked what

he meant, Plaintiff stated, "I hate to talk about this depression thing . . . I know I may be cutting my

own throat but I want to say ain't nothing wrong with me . . . I'm just like I was 30 years ago when

I was in Vietnam."  (Tr. at 48-49.)

Plaintiff testified that he never struggled with his drug problem.  He told the ALJ, "I knew

if I went to St. Cloud and told them I had a problem, . . . then I could get in right away, get examined

all the time . . . instead of waiting six months down here, I could get done in six weeks up there."

(Tr. at 50).  Plaintiff testified that the last time he used cocaine was six months previous to the

hearing, and that he "may have drank a beer or so since then."  (Tr. at 50-51.)

### D.    Medical Expert's Testimony

Carl Malmquist, M.D., testified as a medical expert at the hearing on December 17, 2003.

(Tr. at 52-55.)  Dr. Malmquist is a licensed psychiatrist.  (Tr. at 21.)  The ALJ asked Dr. Malmquist

to "give the Court [his] opinion as to what, if any, impairment [Plaintiff] suffers from, from a mental

and a psychological standpoint only."  (Tr. at 52.)  Dr. Malmquist responded by stating

> I don't think I can separate it from the prostate problem . . . I think the, they probably
> saved his life by the surgery, but he's left with some very severe side effects from it.
> And the three main ones are the ones he's elaborated on.  I mean, this is a man who
> really, probably is incapacitated from working in any consistent way.  He loses
> bowel and bladder control.  He's going to the bathroom three times an hour on and
> on he's testified to that, and his sexual function is gone.  I think he's trying to
> maintain that, on the best level, that somehow he can function some, but I think he
> is depressed because of it . . . I'm bypassing the drug, alcohol problem . . . testimony
> is at this point that he doesn't have any problems in the last six months on that . . .
> I would probably conclude, in a purely psychiatric sense, and, and there's, the
> diagnostic manual allows for depression related to physical illness.  And we don't
> have an exact category like that, but I'd say that he probably has some symptoms
> related under 12.04, but it's hooked up with his physical condition.  That's his major
> limitation.

(Tr. at 53.)  The ALJ asked Dr. Malmquist "on the 12.04, what A criteria do you see present."  (Tr.

14

at 53.)  Dr. Malmquist responded by stating "It seems to me that he's lost interest in a lot of activities, decreased energy, just can't seem to get going on much.  Sees his future in terms of vocational work as, if not overseverely handicapped.  Those are symptoms, I think, connected with depression."  (Tr. at 54.)

When the ALJ asked Dr. Malmquist to describe any B criteria present, Dr. Malmquist responded

> I can't separate it from his physical condition.  Judge, I think they're just intricately hooked up.  Restriction of activities of daily living purely on depression, per se, I'd say that probably more mild to moderate.  But if I hook it in, connect it with his very obvious physical condition and lump them, I'd say marked.  And the same difficulty would hold for the social functioning, say strictly in depression.  It's not a severe depression, but it's definitely hooked up with his physical incapacitation.  Deficiencies of concentration and so on, I'd, I'd probably say mild episodes of deterioration.

(Tr. at 54.)  The ALJ asked Dr. Malmquist "if [Plaintiff] were to work, from a mental standpoint only, what, if any, limitations or restrictions would you place on him?" Dr. Malmquist responded "Well, I'd think he'd have some trouble in terms of persistence in concentration because of his apprehension about where he is at this point in his life, and the future."  (Tr. at 54.)  When asked by the ALJ if it would be appropriate to limit Plaintiff to three or four step tasks, Dr. Malmquist agreed. (Tr. at 55.)  When asked whether Plaintiff had "any limitation as far as contact with other people" Dr. Malmquist stated that in "[a] purely psychiatric sense, purely mental, no."  (Tr. at 55.)  When the ALJ asked Dr. Malmquist "So, if I put low stress environment with minimal industrial standards for production and pace, would that be appropriate?" Dr. Malmquist responded "I'd agree, Judge." (Tr. at 55.)

### E.    Vocational Expert's testimony

Mr. Steve Bosch testified as a vocational expert at the hearing held on December 17, 2003.

(Tr. at 55-58.)  The ALJ posed the following hypothetical to Mr. Bosch:

> Assume we have an individual who at onset was 53, who has a high school plus
> education, who's on a number of unknown medications, with no apparent side
> effects, who's impaired with polysubstance dependence by history, hepatitis C,
> depression, status post prostatic cancer, who is limited to lifting and carrying 20
> pounds occasionally, 10 pounds frequently, would [sic] could do work where there
> would be easy access to bathroom facilities.  And by that I mean certainly on the
> same floor, definitely in the same building.  Who would be limited to tasks that are
> limited to three and four step tasks, low level, semiskilled.  Who could work in a low
> stress environment where minimal industrial standards for production and pace are
> applicable, and in an environment where no drugs or alcohol are available.  Could
> such a person do any of the work [Plaintiff has] previously done?

(Tr. at 56.)  Mr. Bosch responded by stating,

> there has been work in the past as a janitor cleaner that typically can be up to
> medium in terms of exertional demands.  However, there are janitor cleaner jobs that
> are done at the light level, like a housekeeping cleaner and . . . That would be DOT
> code 323.687,014.  That work is light, it is unskilled.  Conservatively, in my opinion,
> there would be 10,000 janitor cleaner jobs available within the hypothetical.  There
> has been past work as a plastic or rubber injection mold machine tender . . . I also
> feel that work fits your hypothetical.  And there would be approximately 2500 to
> 2000 of those jobs available.  I might add that there would be a variety of other
> electronic assembly type jobs that would fit.  There are many DOT codes.  One
> representative DOT code would be 726.685.066.  That's a semiconductor bonder .
> . . which is sedentary and unskilled.  And in the area of electronics assembly in the
> state of Minnesota, it would be my opinion that 5,000 jobs would exist.

(Tr. at 57.)  When asked whether "there are any jobs at the light level using transferable skills?" Mr.

Bosch responded:

> I would say these electronics worker assembler jobs . . . would.  Many of them are
> very low level semiskilled with SVP's of three . . . conservatively in the state of
> Minnesota, we have, I'm referencing statistics here, we have electrical electronic
> assemblers, excluding precision assemblers . . . about 6500.  Taking into
> consideration your hypothetical, I would reduce that conservatively to 3,000.

(Tr. at 57.)

Mr. Bosch was also questioned by Plaintiff's attorney.  When asked "if we assume that

[Plaintiff] had to go to the bathroom two to three times an hour, would that limit those jobs that you

16

described?" Mr. Bosch responded "Needing to go to the bathroom with that frequency, assuming it might take five or ten minutes away, or more, away from the work place . . . practically speaking, that would not allow for competitive employment." (Tr. at 58.)

### F.      The ALJ's Decision

The ALJ issued her opinion on May 24, 2004.  (Tr. at 16.)  The ALJ conducted the five-step sequential evaluation required by 20 C.F.R. 404.1520 in order to determine whether Plaintiff was disabled.  (Tr. at 20.)  The first step in the process begins with a determination of whether Plaintiff has engaged in substantial gainful activity at any time since the alleged onset of the disability which, in this case, is February 15, 2000.  (Tr. at 20.)  The ALJ found that Plaintiff has not engaged in substantial gainful activity since February 15, 2000.  (Tr. at 20.)

The next step in the sequential evaluation process requires the ALJ to determine whether Plaintiff is subject to any severe physical or mental impairments.  The ALJ found that Plaintiff "is severely impaired, as defined in the regulations, by status post residuals of prostate cancer, hepatitis C, depression, and polysubstance dependency by history."  (Tr. at 20.)

The third step in the evaluation process requires a comparison of Plaintiff's severe impairments with the impairments contained in Appendix 1 to Subpart P of the regulations, which can be found at 20 C.F.R. 404.1520(d).  Appendix 1 contains a Listing of Impairments which identifies several different medical conditions and describes a required level of severity for each condition.  If the required level of severity is met, Plaintiff will be deemed disable without consideration of the vocational factors.  The ALJ concluded that, "[b]ased upon the evidence of record . . . [Plaintiff] does not have an impairment, or combination of impairments, that meets or equals the relevant criteria of any listed impairment."  (Tr. at 20.)

17

The ALJ went on to state that, "[b]ecause the record documents the existence of severe mental impairments the [ALJ] has evaluated the severity of these impairments within the provisions of 20 C.F.R. 404.1520a." (Tr. at 20.) In order to evaluate the severity of Plaintiff's mental impairments, the ALJ looked to four broad areas of functioning, including: "activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation, of extended duration." (Tr. at 20.) The ALJ concluded that Plaintiff "has mild limitation of activities of daily living and social functioning, moderate limitations in concentration, persistence, or pace, and no episodes of decompensation, of extended limitation." (Tr. at 20.)

The ALJ noted that Plaintiff was diagnosed with depression, and that Plaintiff's depression was characterized by "anhedonia or pervasive loss of interest in all activities, appetite disturbance, sleep disturbance, decreased energy, and feelings of guilt or worthlessness." (Tr. at 20-21.) The ALJ noted that there was no indication that Plaintiff was unable to independently and adequately complete activities of daily living on a sustained useful basis when necessary. (Tr. at 21.)

The ALJ noted that, in order to "assist in evaluation of [Plaintiff's] mental impairments the [ALJ] arranged for the testimony of Dr. Malmquist, a neutral medical expert." (Tr. at 21.) The ALJ stated that, after reviewing the medical records and listening to the testimony at the hearing, Dr. Malmquist,

> opined when considering [Plaintiff's] physical and mental impairments [Plaintiff] would be unable to tolerate full time employment. However, when assessing [Plaintiff's] functional limitations based on psychological factors Dr. Malmquist's opinion was consistent with the above described functional limitations. Dr. Malmquist opined that [Plaintiff] had mild to moderate limitations in activities of daily living, mild to moderate limitations in social functioning with no work related limitations in this area, mild to moderate limitations in concentration, persistence, or pace, and no episodes of decompensation.

(Tr. at 21.) The ALJ stated that,

> Dr. Malmquist is a licensed psychiatrist . . . and therefore though the [ALJ] has given some weight to his opinion regarding [Plaintiff's] functional limitations, based on psychological impairments, his opinion regarding [Plaintiff's] limitations, secondary to physical impairments, which is not well supported by the evidence of record, is not being given significant weight in this decision.

(Tr. at 21.)  The ALJ noted that the description of Plaintiff's functional limitations is consistent with the State Agency psychological consultants, with one exception.  (Tr. at 21.)  The ALJ noted that, in the opinion of the State Agency psychological consultants, Plaintiff had moderate limitations in social functioning.  (Tr. at 22.)  The ALJ disregarded this opinion, stating "this assessment is not consistent with [Plaintiff's] ability to interact appropriately with physicians and during group therapy sessions, and his stable relationships with his family.  As a result, the [ALJ] finds [Plaintiff] has only mild limitations in the area of social functioning."  (Tr. at 22.)  Taking into account all of the evidence, the ALJ found that Plaintiff "does not have an impairment, or a combination of impairments, which meets or equals the severity of a listed impairment."  (Tr. at 22.)

The next step in the sequential evaluation process is to determine whether Plaintiff has a residual functional capacity (hereinafter "RFC") which permits him to perform his past relevant work or any other work existing in significant numbers in the national economy.  The ALJ noted that Plaintiff "testified that he had the ability to walk for one mile, sit without difficulty, lift up to twenty pounds, with urinary and bowel problems, secondary to status post prostate cancer, requiring that [Plaintiff] use the bathroom two to three times an hour, and depression with decreased concentration."  (Tr. at 22.)  The ALJ stated that since Plaintiff was alleging a disability as a result of subjective complaints, the ALJ reviewed the entire record in accordance with SSR 96-7p, 20 C.F.R. 404.1529(c) and Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984).  (Tr. at 22.)  After considering the entire record, the ALJ concluded that Plaintiff,

retains the [RFC] to perform a light level of work, involving occasionally lifting up to twenty pounds, frequently lifting up to ten pounds, with easy access to a bathroom, and low level semiskilled work consisting of three to four step tasks, with low stress, minimal industrial standards for production and pace, and performed in an alcohol and drug free environment.

(Tr. at 22.)  The ALJ further noted that "[i]n reaching this assessment . . . [the ALJ gave Plaintiff] the benefit of all doubt in imposing exertional and nonexertional limitations in the workplace. However, the [ALJ] cannot find [Plaintiff] credible that he is incapable of all work activity, as a result of his impairments, because of significant inconsistencies in the record as a whole." (Tr. at 22.)

The ALJ noted that "the objective medical evidence and [Plaintiff's] course of treatment are not consistent with the severity of his allegations." (Tr. at 22.)  The ALJ noted that "[a] review of the evidenced  [sic] documents that [Plaintiff] has periodically reported intermittent urinary and bowel problems, never reported the need to use a bathroom as frequently as testimony indicates, and during numerous examinations denied chronic physical symptoms." (Tr. at 22.)  The ALJ further noted that "[d]uring a urology examination, on September 17, 2002, [Plaintiff] reported he had no urinary incontinence . . .  and [Plaintiff's] urology examinations and treatments have been focused towards treating his erectile dysfunction . . . Records confirm the use of incontinence pads which [Plaintiff] reported were working well . . . This lack of significant medical treatment for symptoms of urinary and bowel problems are inconsistent with [Plaintiff's] allegations regarding the severity of his symptoms and functional limitations." (Tr. at 22, citing to Tr. at 375.)

The ALJ further noted that Plaintiff,

testified that subsequent to surgery his bathroom needs were even more significant necessitating three to four bathroom trips in an hour.  However, following surgery [Plaintiff] was able to return to work until February 15, 2000, at which time his employer went out of business. . . . An impairment that was not disabling during

working years, and which has not worsened since the alleged onset date, cannot credibly support a present finding of disability.

(Tr. at 22-23.)

The ALJ also noted that, while Plaintiff does suffer from hepatitis C, this impairment has not been accompanied by symptoms of chronic liver disease and that, in any event, Plaintiff has not yet sought treatment for this condition.  (Tr. at 23.)  The ALJ noted that Plaintiff testified that he does not get any relief from the severity of his symptoms of depression with the use of medication; however, the ALJ did not credit this testimony because Plaintiff has not sought out other medications to treat his depression.  (Tr. at 23.)  Since Plaintiff has not sought out other medications to treat his depression, the ALJ concluded that she "may reasonably infer that [Plaintiff] was satisfied with the effects of the present medications" and hence that Plaintiff "is able to utilize prescriptive medication to control the symptoms of his depression."  (Tr. at 23.)

The ALJ also considered Plaintiff's activities of daily living in assessing the credibility of Plaintiff's allegations that he is unable to perform any gainful activity.  (Tr. at 23.)  The ALJ noted that Plaintiff testified that he,

> did some work around the house, attended a living skills class three times a week . . . he was able to cook, clean, care for his personal hygiene, and manage his own finances.  Testimony and statements in file indicated [Plaintiff's] activities also consisted of going to the YMCA on a weekly basis, watching television following sporting events and the news, and occasional use of the computer to play games such as solitaire.

(Tr. at 23.)  The ALJ concluded that "[t]hese activities are consistent with the limitations set forth for [Plaintiff] and do not support a finding that he is unable to perform all gainful activity."  (Tr. at 23.)

While assessing Plaintiff's credibility, the ALJ took into account Plaintiff's work history.

The ALJ noted "[t]o his credit [Plaintiff] has a history of consistent work since 1984." (Tr. at 23.) However, the ALJ noted that Plaintiff completed a work capacity assessment in May 2000 but failed to follow through with the goals set for him in that assessment, such as completing his college education. (Tr. at 23.) The ALJ further noted that Plaintiff declined a vocational assessment and vocational plan offered to him by the Veterans Administration and concluded that "the record does not suggest a significant effort toward a return to the workplace." (Tr. at 23.) The ALJ further noted that Plaintiff terminated his employment on February 15, 2000, because the company he was working for went out of business, not because of reasons related to the impairments that he claims have rendered him incapable of performing gainful activity. (Tr. at 23.) The ALJ noted that this fact "does not add credibility to an allegation that it is the disability that prevents work." (Tr. at 23-24.) (citing Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994)) (work stoppage caused by loss of work contract and not medical problems supported ALJ's finding that the claimant's testimony was not credible.)

The ALJ stated that the issue is not whether Plaintiff is experiencing pain or discomfort but, rather, whether the symptoms keep Plaintiff from working. (Tr. at 24.) The ALJ noted that, "[d]espite allegations of incapacitating limitations, there is little in the way of medical evidence, there has been only conservative medical treatment, and [Plaintiff's] allegations are also not consistent with other substantial evidence of record including his use of medication, activities of daily living, and work history." (Tr. at 24.) Based on these facts, the ALJ found Plaintiff's statements credible to the extent that those statements were consistent with the weight of the record, but did not find Plaintiff's statements that he was unable to perform all gainful activity to be fully credible. (Tr. at 24.)

The ALJ gave significant weight to the opinions of Dr. Malmquist when assessing Plaintiff's RFC, based on psychological factors.  (Tr. at 24.)  The ALJ noted that "[i]t was the opinion of Dr. Malmquist that when considering the severity of [Plaintiff's] mental impairments that [Plaintiff] could perform work within the previously described limitations."  (Tr. at 24.)  The ALJ noted that "[t]his assessment is also consistent with the opinion of Dr. Karayusof, an examining source . . . and well supported by the overall evidence in the record."  (Tr. at 24.)

The ALJ also considered the findings of the State Agency psychological consultants as required by Social Security Ruling 96-6p.  The opinion of the State Agency psychological consultants was "consistent with the previously described [RFC] but indicates [Plaintiff] is restricted to work involving only brief and superficial contact with the coworkers, supervisors and the general public."  (Tr. at 24.)  However, the ALJ noted that, in Dr. Malmquist's and Dr. Karayusof's opinion, Plaintiff was able to "interact appropriately with coworkers, supervisors and the general public."  (Tr. at 24.)  The ALJ gave greater weight to the opinion of Dr. Malmquist because Dr. Malmquist is a licensed psychiatrist, and had an opportunity to listen to the testimony presented at the hearing.  (Tr. at 24.)  The ALJ gave greater weight to the opinion of Dr. Karayusof, because he was an examining source who completed a consultative evaluation with Plaintiff on September 9, 2000.  (Tr. at 24.)  Therefore, the ALJ gave greater weight to the opinions of Dr. Malmquist and Dr. Karayusof than to the State Agency psychological consultants, and concluded that restrictions on social contact in the workplace were not necessary.  (Tr. at 24.)

The ALJ noted that, in assessing Plaintiff's RFC she gave "significant weight to the opinion of the State Agency medical consultants in restricting [Plaintiff] to the performance of a light level of work, involving occasionally lifting up to twenty pounds and frequently lifting up to ten pounds."

(Tr. at 24.)   The ALJ also noted that, while she did not find Plaintiff's testimony regarding his frequent need to use the bathroom as fully credible, she "provided the need for a work environment with easy access to a bathroom" when assessing Plaintiff's RFC.  (Tr. at 24.)

After determining Plaintiff's RFC, the ALJ moved to the next step of the sequential evaluation; that is, determining whether Plaintiff could return to any of his past relevant work.  (Tr. at 25.)  To this end the ALJ arranged for the testimony of Mr. Steve Bosch, a vocational expert.  Mr. Bosch provided an analysis for the record of Plaintiff's past work.  The analysis and testimony provided by Mr. Bosch "indicates that [Plaintiff] had past relevant light unskilled work as an injection molding machine tender and electronics worker, light semiskilled work as an electronics assembler and medium unskilled work as a janitor." (Tr. at 25.)  In addition, Mr. Bosch testified that "work as a janitor could also be classified as a housekeeper/cleaner which is unskilled light work." (Tr. at 25.)  The ALJ posed a hypothetical to Mr. Bosch, and asked whether such an individual could perform Plaintiff's past relevant work.  (Tr. at 25.)  Mr. Bosch concluded that such an individual could perform Plaintiff's past relevant work as a janitor, specifically a housekeeper or cleaner; as an injection molding machine tender, and an electronics assembler.  (Tr. at 25.)  The ALJ concluded that "[o]n the basis of Mr. Bosch's credible testimony and consistent with the <u>Dictionary of Occupation Titles</u>, in accordance with SSR 00-4p, the [ALJ found that Plaintiff was] able to perform his past relevant work as a janitor (specifically a housekeeper/cleaner), an injection molding machine tender, and an electronics assembler." (Tr. at 25.)  The ALJ noted that Plaintiff's attorney provided Mr. Bosch with

> an additional hypothetical situation including the need to take a bathroom break two
> to three time an hour.  It was the testimony of the vocational expert that this would
> preclude all gainful employment.  However, the [ALJ] cannot find that the evidence
> of record, including medical records, treatment, [Plaintiff's] statements to physicians,

and his activities support the allegation of this frequent need for a bathroom break.

(Tr. at 25.)  Therefore, based on all of these findings, the ALJ concluded that Plaintiff "does not meet the criteria for a statutory finding of disability and he is not entitled to a period of disability or disability insurance benefits pursuant to sections 216(i) and 223 . . . of the Social Security Act." (Tr. at 25.)

### G.    Information Provided to the Appeal Council

Plaintiff submitted a copy of a letter he received from the Department of Veterans Affairs, dated May 21, 2004, with his request for review.  (Tr. at 556-69.)  In that letter the Veterans Administration stated that Plaintiff's service connected compensation would not be reduced from his 2002 entitlement award.  (Tr. at 559.)  The Veterans Administration determined that Plaintiff's depression was not service related, and so he was not awarded benefits based on that claim.  (Tr. at 560.)  The Veterans Administration considered Plaintiff's claim based on prostate cancer, due to exposure to Agent Orange during his Vietnam duty, and granted 100 percent entitlement because he was unable to work due to this condition.  (Tr. at 560.)  The Veterans Administration based their reasoning on Plaintiff's statement that he changed his Depends undergarments five or more times a day, and on the prescription for Depends from the Veterans Administration Clinic, which allowed for up to six Depends undergarments per day.  (Tr. at 564.)  The Veterans Administration stated "[a]n evaluation of 60 percent is assigned whenever there is a requirement for use of an appliance or the wearing of absorbent materials which must be changed more than four times per day."  (Tr. at 565.)  The Veterans Administration noted that "there is a likelihood of improvement [therefore] the assigned evaluation is not considered permanent and is subject to future review examination." (Tr. at 565.)

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g);  see also Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir.1998); Gallus v. Callahan, 117 F.3d 1061, 1063 (8th Cir.1997); Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir.1989).   Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  See Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co., v. NLRB, 305 U.S. 197, 220 (1938)).   In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight.  See Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir.1999); see also Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir.1989) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir.2000); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir.1996).  "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently.  Roberts v. Apfel, 22 F.3d at 468. (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir.2000); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir.1993)).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo.  See Flynn

26

v. Chater, 107 F.3d 617, 620 (8th Cir.1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir.1996).  The

Court must "defer heavily to the findings and conclusions of the SSA." Howard v. Massanari, 255

F.3d 577, 581 (8th Cir.2001).

When information is provided to the Appeals Council that is not provided in the record

submitted to the ALJ, "the Appeals Council must evaluate the entire record, including any new and

material evidence that related to the period before the date of the ALJ's decision." Cunningham v.

Apfel, 222 F.3d 496, 500 (8th Cir.2000) (citing 20 C.F.R. § 404.970(b)).  In addition, "[t]he timing

of an examination is not dispositive of whether evidence is material; medical evidence obtained after

an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's

decision." Id. at 502.  Where the Appeals Council denies review, either finding that the new

evidence was not material or did not detract from the ALJ's conclusion, the Court does not "evaluate

the Appeals Council's decision to deny review, but rather [the Court determines] whether the record

as a whole, including the new evidence, supports the ALJ's determination." Id. at 500.

Disability is defined as "the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months."  20

C.F.R. § 404.1505(a).  In making the disability determination the Secretary promulgated a sequential

evaluation process which applies to both physical and mental disorders.  20 C.F.R. §404.1520

outlines the five-step sequential process used by the ALJ to determine whether a claimant is

disabled.  The disability determination requires a step-by-step analysis. See 20 C.F.R. §404.1520(a).

At the first step, the ALJ must consider Plaintiff's work history.  At the second step, the ALJ must

consider the medical severity of Plaintiff's impairments.  At the third step, the ALJ must consider

whether Plaintiff has an impairment or impairments that meet or equals one of the listings in Appendix 1 to Subpart P of the regulations.  See 20 C.F.R. 404.1520(d).  If Plaintiff's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of Plaintiff's residual functional capacity and Plaintiff's past relevant work.  If the ALJ determines that the claimant can still perform his or her past relevant work, the ALJ will find that the claimant is not disabled.  If the claimant cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." Cunningham, 222 F.3d at 501.

In the present case, the ALJ noted that Plaintiff had not engaged in substantial gainful activity since February 15, 2000.  The ALJ further found that Plaintiff is "severely impaired, as defined by the regulations, by status post residuals of prostate cancer, hepatitis C, depression, and polysubstance dependency by history." (Tr. at 20.) Therefore, the ALJ found that Plaintiff satisfied the first two steps of the analysis.  The ALJ further found that Plaintiff did not have an impairment, or a combination of impairments, that meets or equals the impairments contained in Appendix 1 to Subpart P.  Therefore, having disposed of the third step in the sequential analysis, the ALJ moved on to the fourth step, which required the ALJ to assess Plaintiff's RFC and determine whether Plaintiff could still engage in his past relevant work.  It is within the fourth step of the ALJ's analysis that Plaintiff argues that the ALJ committed error.

# IV.  CONCLUSIONS OF LAW

## A.      The ALJ Gave Proper Weight to the Opinion of Dr. Malmquist

Plaintiff argues that the ALJ substituted her own opinion for that of Dr. Malmquist by relying

on the opinions of the reviewing DDS medical sources. (Pl.'s Mem. at 29-30.)  Plaintiff argues that,

the Eighth Circuit holding in <u>Nunn v. Heckler</u>, 732 F.2d 645, 648 (8th Cir.1984) is instructive in the

present case, because in that case the Eighth Circuit held that an ALJ's reliance on the opinions of

and the residual functional capacity checklist completed by consulting physicians who only

examined claimant on one occasion did not constitute substantial evidence on the record as a whole

to support the finding that claimant could return to her past work.  <u>Id.</u>; (<u>see</u> Pl.'s Mem. at 30.)  Here

Plaintiff argues that the DDS physicians did not even examine Plaintiff, but simply reviewed the

records in Plaintiff's file at the time of the examination.  Plaintiff argues that, since Dr. Malmquist

was the last medical expert to review the entire file with all of the corresponding evidence, his

opinion should be given more weight than the opinions of the reviewing medical sources.  (Pl.'s

Mem. at 30.)  However, the ALJ is in fact charged with the task of reviewing all of the evidence and

weighing the differing opinions in order to arrive at a factual conclusion regarding the conflicting

testimony.  <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. at 399 ("The trier of fact has the duty to resolve [the

medical evidence] conflict.")

The present case differs from <u>Nunn v. Heckler</u> in that the reasons given by the ALJ for not

accepting Dr. Malmquist's statement were supported by the record.  The ALJ did not accept Dr.

Malmquist's opinion because Dr. Malmquist's statement was not well supported by the evidence

in the record.  (Tr. at 21.)  When addressing Plaintiff's physical impairments, the ALJ noted that

"[d]espite allegations of incapacitating limitations there is little in the way of medical evidence,

there has been only conservative medical treatment, and [Plaintiff's] allegations are also not consistent with other substantial evidence of record including his use of medication, activities of daily living, and work history." (Tr. at 24.) Therefore, the ALJ properly used her discretion to not accept part of Dr. Malquist's opinion because it was not supported by the evidence in the record.

The ALJ further noted that there was not credible evidence in the record to support Plaintiff's claim that he had to use the bathroom as often as he claimed at the hearing. The ALJ noted that Plaintiff intermittently complained about urinary and bowel problems, and that he never complained about these problems with the frequency with which he claimed to suffer from these problems at the hearing. (Tr. at 22.) The ALJ further noted that Plaintiff had a urology examination on September 17, 2002, and he reported that he did not have any urinary incontinence. (Tr. at 22.) The ALJ further noted that Plaintiff's urology examinations and treatments were focused on treating his erectile dysfunction, not his urinary incontinence problem, even though Plaintiff claims that it is the urinary incontinence problem that is debilitating. (Tr. at 22.) The ALJ noted that during several other physical examinations during the time period Plaintiff claims to be suffering the debilitating urinary incontinence, Plaintiff in fact denied chronic physical problems. (Tr. at 22.) Therefore the ALJ pointed to sufficient evidence in the record to support her conclusion that Dr. Malmquist's opinion as to the combination of Plaintiff's mental and physical impairments was not supported by the evidence in the record. The ALJ did not completely discredit Plaintiff's claim that he suffered from urinary incontinence problems; rather, she simply stated that Plaintiff did not require any greater treatment than use of incontinence pads and that she did not accept Plaintiff's claim that he needed to use the bathroom as frequently as he claimed.

Furthermore, the evidence in the record supports the ALJ's finding that Plaintiff could

perform light work with easy access to a bathroom.  In October 2000, Dr. Gorman opined that Plaintiff could perform work at the medium exertional level, and in January 2001 Dr. Suddard affirmed this assessment.  (Tr. at 297-306.)  In December 2002, Dr. Grant opined that Plaintiff could work at the light exertional level, and during this evaluation Dr. Grant specifically noted that Plaintiff had not reported any urinary symptoms in the urology note dated September 12, 2002.  (Tr. at 418-25.)  In February 2003 Dr. Larson affirmed Dr. Grant's analysis.  (Tr. at 425.)  Based on the state agency opinions that Plaintiff could perform light and medium work, and based on the fact that Plaintiff was treated with a conservative course of care and was never given any restrictions by his treating physicians, the ALJ's finding that Plaintiff can perform light work with easy access to a bathroom is supported by substantial evidence in the record as a whole.

**B.    The ALJ's Credibility Determination Is Supported by Substantial Evidence**

Plaintiff argues that the ALJ failed to undertake a meaningful analysis of Plaintiff's credibility under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984).  To assess Plaintiff's credibility, the ALJ had to consider all of the evidence, including prior work records, observations by third parties and observations by treating and examining physicians regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984).  The ALJ is required to make an express credibility determination explaining why he did not fully credit Plaintiff's complaints.  See Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir.1991).  The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole.  See Polaski, 739 F.2d at 1322.  Where

31

adequately explained and supported, credibility findings are for the ALJ to make. See Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir.2000).

The ALJ's credibility finding is entitled to considerable deference. See e.g., Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir.1996) (The court does not substitute its opinion of the plaintiff's credibility for that of the ALJ). If subjective testimony of symptoms is inconsistent with the record as a whole, the ALJ may disbelieve and discount that testimony. Polaski, 739 F.2d at 1322; Gray v. Apfel, 192 F.3d 799, 803 (8th Cir.1999). It is not necessary for the ALJ to explicitly discuss each Polaski factor, but if an ALJ rejects a claimant's testimony, she must make an express credibility determination explaining the reasons for not believing the testimony. Brown v. Chater, 87 F.3d 963, 965 (8th Cir.1996); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir.2000).

In the present case, there is substantial evidence in the record to support the ALJ's credibility analysis. The ALJ discussed Plaintiff's credibility throughout her decision, and noted that Plaintiff's subjective testimony of his symptoms was inconsistent with the record as a whole. For example, the ALJ noted that the "[a]ctivities of daily living questionnaires indicate [Plaintiff] was poorly motivated to maintain cleanliness and needed help form [sic] his family but there are no indications [Plaintiff] was unable to independently and adequately complete these activities on a sustained useful basis when necessary." (Tr. at 21.) Further on in the opinion, the ALJ noted that "MMPI testing indicated that [Plaintiff] was socially introverted, avoided contact with others, and was distrustful of others, however, [Plaintiff] related appropriately to all treating sources, he maintained stable interpersonal relationships, attended group therapy sessions, and there is no significant history of altercations, evictions, firings, fear of interpersonal relationships, or social isolation." (Tr. at 21.) The ALJ further noted that "[t]hough there is a record of chemical dependency treatment [Plaintiff]

32

has not required psychiatric hospitalizations or crisis center interventions secondary to depression."

(Tr. at 21.)

When addressing Plaintiff's subjective complaints, the ALJ noted that Plaintiff,

testified that subsequent to surgery he experiences urinary and bowel problems which requires the use of a bathroom two to three times an hour and prevents him from working. A review of the evidenced documents that [Plaintiff] has periodically reported intermittent urinary and bowel problems, never reported the need to use a bathroom as frequently as testimony indicates, and during numerous physical examinations denied chronic physical symptoms . . . During a urology examination, on September 17, 2002, [Plaintiff] reported he had no urinary incontinence . . . and [Plaintiff's] urology examinations and treatments have been focused on treating his erectile dysfunction. Records confirm the use of incontinence pads which [Plaintiff] reported were working well.

(Tr. at 22.)  The ALJ concluded that the significant lack of medical treatment for "symptoms of urinary and bowel problems are inconsistent with [Plaintiff's] allegations regarding the severity of his symptoms and functional limitations."  (Tr. at 22.)

The ALJ further noted that Plaintiff was able to return to work after having prostate surgery, and that he stopped working on February 15, 2000, not because of his physical impairments but because the company he was working for went out of business.  (Tr. at 23.)  The ALJ further noted that, while Plaintiff suffered from hepatitis C, he had never received treatment for this impairment.

When assessing Plaintiff's credibility, the ALJ further noted that, while Plaintiff testified to depression with some concentration difficulties, the record showed that the psychological treatment Plaintiff received had "generally been geared to treating [Plaintiff's] polysubstance abuse disorder as opposed to treatment for depression." (Tr. at 23.)  The ALJ further noted that, while Plaintiff stated his depression was being treated by medication, the record was full of frequent denials of the use of medication to treat his depression.  (Tr. at 23.)  Furthermore, the ALJ noted that, while Plaintiff testified that "he received no relief in the severity of his symptoms with the use of

medication" Plaintiff had never sought out other medications to treat his depression, and therefore the ALJ concluded that Plaintiff was satisfied with the effects of his medications.  (Tr. at 23.)

Finally, in assessing Plaintiff's credibility, the ALJ noted that Plaintiff engaged in activities of daily living that were inconsistent with Plaintiff's allegations that he was unable to perform any gainful activity.  The ALJ noted that Plaintiff testified that he

> did some work around the house, attended a living skills class three times a week . . . he was able to cook, clean, care for his personal hygiene . . . manage his own finances . . . [he went] to the YMCA on a weekly basis, watch[ed] television following sporting events and the news, and [made] occasional use of the computer to play games.

(Tr. at 23.)

The ALJ credited Plaintiff with a strong work history; however, the ALJ noted that Plaintiff has not made a significant effort toward a return to the workplace, because he failed to follow through with the goals set for him after his May 2000 completion of a work capacity assessment, and because he failed to take advantage of a vocational assessment and vocational plan offered by the Veterans Administration.  (Tr. at 23.)

Therefore, in the present case, the ALJ considered the evidence in the record as a whole, and determined that there were inconsistencies in the record such that Plaintiff's allegations that he could not engage in any gainful activity were not fully credited.

### C.    The Record As A Whole, Including the Evidence Submitted By Plaintiff to the Appeals Council, Supports the ALJ's Conclusion.

As an initial matter, the fact that the Veterans Administration issued a finding of disability for Plaintiff has no bearing on whether Plaintiff qualifies for a finding of disability under 20 C.F.R. § 404.1505.  The findings of disability by other federal and state agencies are not binding on the Social Security Administration, because the Social Security Administration can only issue a finding

34

of disability if its criteria for determining disability are satisfied.  In the present case, the Veterans Administration issued a finding of disability because, under Veterans Administration guidelines, "[a]n evaluation of 60 percent is assigned whenever there is a requirement for the use of an appliance or the wearing of absorbent materials which must be changed more than four times per day."  (Tr. at 565.)

In the present case, Mr. Bosch, the vocational expert, testified that "ready access" to a bathroom would allow an individual with Plaintiff's limitations the ability to work.  (Tr. at 56.)  Mr. Bosch testified that, if the individual had to use the bathroom two to three times an hour, that individual would be precluded from meaningful employment.   (Tr. at 58.)   The Veterans Administration found that Plaintiff needed to change his undergarments at least five times or more per day, and that Plaintiff had been given a prescription for Depends undergarments for up to six per day.  (Tr. at 564.)  This finding by the Veterans Administration is not inconsistent with the ALJ's restriction in the present case that Plaintiff needs "ready access" to a bathroom because, however a day is defined, be it a twenty-four hour period, the sixteen-hour period that Plaintiff is awake, or an eight-hour work day, Plaintiff could change his absorbent pads enough to qualify for benefits with the Veterans Administration and yet be eligible to work under the regulations of the Social Security Administration.

In addition, "[a]s long as substantial evidence in the record supports the Commissioner's decision, [a court] may not reverse [the decision of the ALJ merely] because substantial evidence exists in the record that would have supported a contrary outcome . . . or because [the court] would have decided the case differently."  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir.2000) (internal citations omitted); see also Gaddis v. Chater, 76 F.3d 893, 895 (8th Cir.1996).  For these reasons,

the Court rejects Plaintiff's arguments and finds that substantial evidence supports the ALJ's determination that Plaintiff does not qualify for a disability. "Consequently, 'even if we might have weighed the evidence differently, we may not reverse the Secretary's decision when there is enough evidence in the record to support either outcome.'" Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir.1994) (quoting Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir.1992)).

Therefore, in the present case, there is substantial evidence in the record to support the ALJ's decision to disregard Dr. Malmquist's opinion that the combination of Plaintiff's physical and mental impairments rendered him incapable of engaging in any gainful employment. Furthermore, there is substantial evidence in the record to support the ALJ's decision that Plaintiff's subjective allegations were not fully credible.

## V. RECOMMENDATION

Based on the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment [# 12 ] be **DENIED**.

2.    Defendant's Motion for Summary Judgment [#17] be **GRANTED**.


DATED: February 9, 2006                   s/ *Franklin L. Noel*
                                          FRANKLIN L. NOEL
                                          United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 1, 2006**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.